```
┌─────────────────────────────┐
│ USDC SDNY                   │
│ DOCUMENT                    │
│ ELECTRONICALLY FILED        │
│ DOC #: _____         │
│ DATE FILED: 4/24/09         │
└─────────────────────────────┘
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
                                                    :
UNITED STATES OF AMERICA,                           :
                                                    :
            -v.-                                    :
                                                    :
GEORGE BALIS,                                       :
                            Defendant.              :
                                                    :
--------------------------------------------------------------x

08 Civ. 5637 (GEL)
03 Cr. 1028 (GEL)

**OPINION AND ORDER**

George S. Balis, pro se.

Lev Dassin, Acting United States Attorney for the Southern
District of New York (Joshua Klien, Assistant United States
Attorney, of Counsel), New York, NY, for respondent.

GERARD E. LYNCH, District Judge:

George Balis moves pursuant to 28 U.S.C. § 2255 to vacate his conviction for
conspiracy, securities fraud and wire fraud, charging that he received ineffective assistance of
counsel. The petition will be denied.

## BACKGROUND

On August 9, 2005, after a five-day trial, a jury returned a verdict convicting Balis of
conspiracy, securities fraud and wire fraud. The charges grew out of a scheme to defraud an
investor by persuading him to invest $300,000 in a corporation called Millennium Direct, Inc., of
which Balis was the Chairman and Chief Executive Officer, by falsely representing to him that
the investment would be used to finance Millennium and to make and televise an infomercial for
its products, when in fact fully half of the investment was to be kicked back to a third party who
had introduced the investor. Since the third party was a Government informant, the purported
investor was actually an undercover FBI agent, and Balis's co-conspirator "flipped" and testified
for the prosecution, and since the conversations in which Balis and his associate met with the

informant and the undercover "investor" were all recorded, the evidence of Balis's guilt was overwhelming.  Balis's conviction was affirmed by the Second Circuit in a summary order on August 10, 2007.  See United States v. Balis, 244 Fed. Appx. 397 (2d Cir. 2007).

Balis has served his term of twenty-four months' imprisonment, and is now on supervised release.  He petitions to vacate his sentence, arguing that his appointed attorney, Michael Bachner, was ineffective in failing to interview or call certain witnesses, to have Balis testify in his own defense, to present an entrapment defense, to defend against the conspiracy count, to request a Brady hearing, and to make certain arguments at sentencing.  Because at least some of Balis's arguments asserted facts outside the trial record, the Court sought a response from Mr. Bachner, as well as from the Government.  Upon careful consideration of those responses, of Balis's petition and reply, and of the trial record, the Court finds all of Balis's arguments completely without merit.

## DISCUSSION

"[I]n order to prevail on an ineffective-assistance-of-counsel claim, a defendant must show (1) that his attorneys' performance fell below an objective standard of reasonableness, and (2) that as a result he suffered prejudice."  United States v. Jones, 482 F.3d 60, 76 (2d Cir. 2006), citing Strickland v. Washington, 466 U.S. 668, 687 (1984).  In assessing the reasonableness of counsel's performance, there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," Parisi v. United States, 529 F.3d 134, 141 (2d Cir. 2008), quoting Strickland, 466 U.S. at 689, and to satisfy this portion of the test, a defendant must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  Hemstreet v. Greiner, 491 F.3d 84, 89 (2d Cir. 2007), quoting Strickland, 466 U.S. at 694.  To establish prejudice, the defendant must

2

demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Lynn v. Bliden, 443 F.3d 238, 247 (2d Cir. 2006), citing Strickland, 466 U.S. at 688, 694.

Far from sinking to this level of deficiency, Mr. Bachner's performance as counsel was exemplary. Contrary to Balis's wholesale charge that Mr. Bachner failed adequately to prepare for trial, and neglected the case for the benefit of his paying clients (D. Mem. 5-6; D. Reply 4-5), Mr. Bachner's vigorous and well-planned defense did as much as could be done to raise potential doubts in the face of the extensive evidence of Balis's crimes. After the jury's verdict, the Court specifically stated that "the case was exceptionally well tried, and I think particularly by the defense." (Tr. 786.) Though expressly noting its complete agreement with the jury's verdict, in light of the "overwhelming" evidence, the Court noted that "a very well tried case by the defense made it perhaps . . . a little more of a horse race at the end of the trial than I expected it would be[,] and I very much appreciate the quality of the presentation by both sides." (Id.) None of Balis's various after-the-fact charges casts any doubt on that assessment.

## I.      Failure to Call Witnesses

Balis contends that counsel failed to interview or call various witnesses at trial, who Balis contends would have been helpful to the defense. Whether to call "particular witnesses is peculiarly a question of trial strategy which courts will practically never second-guess," United States ex rel. Walker v. Henderson, 492 F.2d 1311, 1314 (2d Cir. 1974) (internal citations omitted), and "counsel's decision as to whether to call specific witnesses – even ones that might offer exculpatory evidence – is ordinarily not viewed as a lapse in professional representation," United States v. Best, 219 F.3d 192, 201 (2d Cir. 2000) (internal quotations omitted). "[S]trategic choices made after thorough investigation of law and facts relevant to plausible

3

options are virtually unchallengeable." Henry v. Poole, 409 F.3d 48, 63 (2d Cir. 2005), quoting

Strickland, 466 U.S. at 690. Defense attorneys do have a duty "to make reasonable

investigations or to make a reasonable decision that makes particular investigations

unnecessary." Greiner v. Wells, 417 F.3d 305, 320-21 (2d Cir. 2005), quoting Strickland, 466

U.S. at 691. But "even strategic choices made after less than complete investigation do not

amount to ineffective assistance – so long as the known facts made it reasonable to believe that

further investigation was unnecessary." Henry, 409 F.3d at 63, citing Strickland, 466 U.S. at

690-91.

Balis charges that defense counsel unreasonably failed to call (1) expert witnesses; (2) a

chemist involved in preparing sample kits of the Millennium's principal product, a skin-care

product called Theracel; (3) the owner of a company that provided an ingredient for the product;

(4) the chairman of Millennium's audit committee; and (5) Balis's wife. None of these claims

are remotely persuasive.

At the outset, it should be noted that Mr. Bachner has submitted an affidavit refuting

these claims and detailing his extensive investigation into the merits of the potential testimony of

these various witnesses, his discussions with Balis and his wife about trial strategy, and his

analysis of the value of the witnesses' alleged testimony. (Bachner Aff. ¶¶ 9-27.) The

thoroughness of this submission in itself amply refutes Balis's accusations of inadequate

preparation, demonstrating a mastery of the issues in the trial, and stands in sharp contrast to

Balis's accusations, which are unsupported by any affidavits from the purported witnesses

setting forth what they would actually say.[1]

---

[1] Balis attempts to explain the dearth of supporting affidavits by reference to the fact that
he had been in federal custody. (D. Reply 45.) Even if the fact of incarceration could somehow

4

But the simplest response to Balis's argument is that the bulk of the testimony he claims his attorney negligently failed to present is essentially irrelevant to the charges on which Balis was convicted. The heart of the charge was that Balis and his co-conspirator concealed from the investor that half of the money he was agreeing to put up was not going for any productive use, but was being kicked back to the finder (the informant) who had introduced the (undercover) investor. Much of Balis's proposed testimony (such as that of the chemist, the proposed "infomercial expert," and Mrs. Balis) has nothing to do with that charge, as none of those witnesses were present at the meetings with the informant or the undercover investor, or had any non-hearsay knowledge of the nature or truth of the representations that were made.[2]   Rather, Balis primarily contends that they had knowledge of the legitimacy of Theracel, Millennium's product that was the subject of its infomercial.

This subject was of marginal, if any, relevance to the trial. One Government witness, Jay Scoratow, who was to have produced and financed the infomercial, testified briefly about alleged defects in the Theracel kits. But this testimony was received for the expressly limited purpose of providing background to the financial necessity that led to the quest for additional investors. The Court emphatically instructed the jury that Balis "isn't on trial for anything to do with his

---

fill the void, it is disingenuous to say the least, as Balis had, by the time of his response papers, been released from custody for over six months and still failed to procure affidavits from any of the proposed witnesses, one of whom is his wife.

[2] With respect to his wife, Balis concedes that she never interacted with the investor (D. Reply 25), but contends that she could have testified about conversations with Balis's co-conspirator regarding the finder's fee. But whatever she and the co-conspirator may have discussed is separate from, and could not have overcome the overwhelming evidence of, the critical misrepresentations upon which Balis was convicted. With regard to the crucial events, Mr. Bachner avers that the decision not to call Mrs. Balis was made, among other reasons, because her testimony would have consisted of nothing more than "self-serving hearsay." (Bachner Aff. ¶ 27; see also id. ¶ 26..)

conduct relating to Mr. Scoratow." (Tr. 83.) Balis's obsession with the purported legitimacy of the product and the commercial potential of the infomercial simply corroborates Mr. Bachner's observation that it was Balis who insisted that the defense play the infomercial tapes for the jury and heavily cross-examine Scoratow about the efficacy of Theracel (Bachner Aff. ¶ 19) – unquestionably the weakest aspect of the defense strategy, which succeeded only in conveying the impression that Balis was something of a snake-oil salesman as well as a securities fraudster. Balis's contention that additional witnesses should have been introduced to counteract this negative image of him is unpersuasive as the alleged merit of Theracel is irrelevant to the charges on which Balis was convicted, and there is absolutely no reason to think that the jury's belief that Theracel was an effective product or that Balis marketed it with "care" (D. Reply 14) would have altered the verdict. At any rate, to the extent the merits of the product had anything to do with the case, the playing of the infomercial for the jury gave them ample opportunity to assess its claims.

The other witnesses suggested by Balis are no more relevant. For example, he contends that a securities law expert should have been called to testify that finders' fees are not illegal, that his discussions with the informant were typical of "exploratory" or even deceitful conversations with finders in which businessmen engage without any intention of actually making payment, and that Balis likely did not intend to pay the informant as he promised because such a transaction would need to be reported by Millennium under the provisions of the Sarbanes-Oxley Act – although he does not identify any expert who would have been prepared so to testify.

The proposed testimony is variously irrelevant, impermissible, or unpersuasive. The Government did not contend that there was anything illegal about paying a finder's fee; the only

6

illegality alleged was the deception of the investor about its magnitude.  No expert would have

been permitted to testify as to his or her speculative opinion about Balis's likely intent.

Testimony that the finder's fee would have required to be disclosed under Sarbanes-Oxley

(whether from an expert or from the Chairman of Millennium's audit committee, another witness

proposed by Balis) could hardly have persuaded the jury that Balis would have in fact disclosed

it, in view of the fact that (1) the jury heard Balis on tape agreeing to a scheme to disguise the

fee as a legitimate business expense, and (2) the jury knew that the law required Balis to disclose

the full extent of the fee to the investor, whom instead he falsely told that a fee of 10% would be

paid, when in fact, they had agreed to a 50% finder's fee.[3]

    Finally, assuming (improbably) that a qualified expert could be found who would

plausibly testify that executives often falsely promise to pay finders' fees in the early stages of

negotiations with individuals proposing to recruit investors, and that such testimony would have

supported Balis's defense that he did not mislead the investor because he never intended to pay

the informant the promised fee, such testimony would have been at odds with Balis's actual

behavior.  Far from simply dangling a fee in front of the informant in the early stages of the

relationship, Balis and his co-conspirator continued to engage in conversations with the

informant promising a fee and devising ways to conceal it from the investor and disguise it as a

legitimate business expenditure as much as ten days after the investor in fact appeared on the

scene.  As the Government points out, "[i]f, as Balis contends, an expert would have testified

that discussions with finders become serious 'only if a finder was believed to be capable of

---

[3] For similar reasons, testimony concerning what costs may legitimately be associated
with the production of an infomercial (as Balis contends an infomercial expert could have
provided) would have been unavailing.

7

making an introduction to an investor' then Balis's continued endeavors to deceive [the

investor], even after meeting him, proved him guilty even under this theory." (Govt. Letter-

Brief at 13.)

Mr. Bachner credibly testifies that he interviewed most of these witnesses, and/or

concluded after due deliberation that their testimony would have been unhelpful or

counterproductive.  But even if he failed in some respect, it is decisively clear that the failure to

call these witnesses was reasonable in light of the issues tried to the jury, and that a different

decision would not have affected the outcome.  Accordingly, Balis's claims about uncalled

witnesses do not offer any reason to disturb his conviction.

**II.      Balis's Failure to Testify**

Balis does not contend that counsel did not advise him of his right to testify in his own

defense, or that counsel overrode his decision and prevented him from testifying against his will.

Any such contention would be incredible, given that Balis is himself a lawyer who has clerked

for a federal district judge, and thus was better positioned than most defendants to understand

and assert his rights even if counsel failed properly to explain them.  Rather, he concedes that

Mr. Bachner discussed with him the possibility of his testifying.  (D. Mem. 14.)  Nevertheless,

he claims that he did not to testify only because Mr. Bachner had not properly prepared him to

do so.  The claim is unpersuasive.

Mr. Bachner's affidavit explains in detail the circumstances leading to Balis's not taking

the stand.  He avers that "[f]rom the very outset, Balis did not want to testify," noting that Balis

was correctly concerned about the wealth of cross-examination material regarding other alleged

misconduct in the possession of the Government.  (Bachner Aff. ¶ 24.)  The Government

confirms Mr. Bachner's assertion that it had, and had disclosed to the defense, tape recordings of

8

Balis discussing stock manipulations with a convicted swindler and Government cooperator.
(Id.; Govt. Letter-Brief at 23-24 & n. 15, 27-28 & n.17.)  The Government could also have cross-examined Balis about dealings with an organized crime associate, corporate funds used to pay personal expenses, allegedly fraudulent bankruptcy filings, and an investigation by the Westchester County District Attorney regarding whether Balis was involved (in connection with his law practice) in a plot to threaten a witness in a criminal case.  (Bachner Aff. ¶ 24; Govt. Letter-Brief at 23-24 & n.15.)  The record confirms the Government's knowledge of many of these matters, as the Government raised them in connection with Balis's sentencing.  (S. Tr. 45-50; Govt. S. Mem. 10-13; 14.)[4]  Finally, Mr. Bachner credibly attests that, having discussed his defenses with counsel "*ad nauseam*," Balis would have been fully prepared to go on the stand had he chosen to do so, but that Balis himself decided not to testify, in part because the effective cross-examination of the cooperating co-conspirator (a thoroughly corrupt individual) gave the defense team hope that a reasonable doubt defense could be successful.  (Bachner Aff. ¶ 25.)

As the Second Circuit has held, the submission of a "detailed affidavit from trial counsel credibly describing the circumstances surrounding [the defendant's] failure to testify" is "sufficient to support dismissal of [a § 2255] petition" asserting denial of the defendant's right to testify.  Chang v. United States, 250 F.3d 79, 85 (2d Cir. 2001).  Counsel's detailed submission here amply meets that standard.  Given the general implausibility of Balis's story, and the severe

_____

[4] Balis contends that he could have successfully rebutted all of this negative evidence, but nevertheless concedes that these issues were highly problematic; indeed, he asserts that "as a solution to the conundrum" he suggested that his wife testify and that "[i]n this way, much of the testimony that [Balis] would have given could have been conveyed to the jury by his wife without the various new issues being brought out by the Government."  (D. Reply 18.)  Any plan to channel Balis's testimony through his wife to avoid cross-examination would have relied on the presentation of hearsay, and would not have been countenanced by the Court.

impeachment to which he would have been subject – which would have had the collateral

consequence of injecting into the trial evidence of additional allegations against Balis that

counsel had succeeded in persuading the Government not to seek to introduce (see Bachner Aff.

¶ 24), the decision not to testify was tactically sound and does not represent a dereliction on the

part of counsel.[5]

## III.    Failure to Present an Entrapment Defense

Balis's argument that counsel was ineffective in failing to present an entrapment defense

is similarly unavailing.  Given the pervasive involvement of Government agents in the plot, any

competent defense attorney would have considered the possibility of such a defense, and Mr.

Bachner avers that such a defense was indeed "discussed and rejected" by himself and Balis.

(Bachner Aff. ¶ 28.)  The choice of a defense strategy at trial is one of the "virtually

unchallengeable" tactical decisions left to the judgment of defense counsel.  See United States v.

Cohen, 427 F.3d 164, 170 (2d Cir. 2005); see also United States v. Vegas, 27 F.3d 773, 777-78

(2d Cir. 1994).  But even if the Court were prepared to second-guess counsel's decision not to

present an entrapment defense, the reasons why counsel chose not to present this notoriously

difficult defense, see e.g., Isaraphanich v. United States, 632 F. Supp. 1531, 1534 (S.D.N.Y.

1986), are obvious to anyone with a passing familiarity with criminal trials.

In order to prevail on an entrapment defense, a defendant must not only show that he was

induced by Government agents to engage in criminal conduct, but must also defeat the

---

[5] Balis contends that the impeachment evidence that prevented him from testifying "only
arose near trial" and that Mr. Bachner unreasonably did not begin to prepare Balis to testify
before these issues surfaced.  (D. Reply 17.)   The record does not support Balis's assertion
concerning the timing (see Govt. S. Mem. 10-13 (documenting potential impeachment events
occurring in 2000)), but even if true, once these issues did arise, Balis's decision not to testify
became a reasonable, indeed inevitable, strategic choice.

Government's efforts to demonstrate that he was predisposed to commit the crime. United States v. Taylor, 475 F.3d 65, 69 (2d Cir. 2007). The Government may show predisposition, among other things, by evidence that the defendant responded readily to the inducement, and by evidence of "an existing course of criminal conduct similar to the crime for which he is charged." United States v. Valencia, 645 F.2d 1158, 1167 (2d Cir. 1980). Moreover, while entrapment may be argued in the alternative, the defense in effect admits that the defendant engaged in criminal conduct, and attempts to explain away the commission of criminal acts. Defense counsel tend to shy away from alternative arguments that dilute the force of a denial of wrongdoing.

All of these factors would counsel against raising an entrapment defense here. As the Government points out, although its agents gave Balis the opportunity to commit the crime, they did not solicit it: the informant suggested introducing an investor, and sought a finder's fee – conduct that was not wrongful in itself – but did not solicit Balis to lie to the investor about the fee; it was Balis and his co-conspirator who took the lead in that scheme. (Govt. Letter-Brief at 26; see Tr. 249-50.) More importantly, even if a jury found inducement, the evidence overwhelmingly demonstrates Balis's predisposition to commit the crime. The tapes do not show Balis reluctantly agreeing to the criminal plan after persuasion by the Government or anyone else, but reveal him participating willingly in the scheme; as Mr. Bachner puts it, they show that he "laughed, joked and consented." (Bachner Aff. ¶ 28 n.2.) Even more disastrously, had Balis raised such a defense, the door would have been opened to further proof of predisposition, in the form of evidence of Balis's other bad acts discussed above. Finally, Mr. Bachner notes that the defense actually presented, that Balis did not mislead the purported investor because he never intended to pay the finder's fee, was more consistent with the tapes

11

than an entrapment defense, and that arguing entrapment in the alternative "would have diluted the defense by arguing out of both sides of [his] mouth." (Id. ¶ 28 & n.2.)

Thus, the failure to raise an entrapment defense was not a departure from reasonable professional standards.

## IV.    Failure to Defend the Conspiracy Charge

Balis's claim that counsel failed to defend against the conspiracy count is simply false. Mr. Bachner's summation opened by emphasizing that he could not be convicted of conspiring with a Government agent, and that to convict him of conspiracy, it would be necessary to find that he conspired with his co-defendant, who had testified for the Government. (Tr. 627-28.) He then extensively and directly argued that Balis had not entered an agreement with that individual, and that the latter's testimony that he had done so was not worthy of belief. That these points were not made through the testimony of defense witnesses is immaterial. The claim is thus frivolous.

## V.    Remaining Allegations

None of Balis's remaining allegations merit extensive discussion. His claim that counsel failed to seek a downward departure based on extraordinary medical condition is inconsistent with the facts. Balis claims that Mr. Bachner failed to present the Court with a statement from an endocrinologist attesting to such a condition. (D. Mem. 25.) However, the statement on which Balis relies is dated June 27, 2006 – nearly four months after Balis's sentencing. Balis did not mention his alleged poor health to the probation officer compiling the pre-sentence report (indeed, the PSR notes that Balis had described his health as "OK") (see PSR ¶ 48) nor did he raise the matter himself when addressing the Court at sentencing. (S. Tr. 54-58.) Moreover, when counsel *was* advised of these medical problems, after sentence had been imposed, he

12

promptly brought them to the Court's attention, in an application for bail pending appeal. (Bachner Aff. ¶ 34 n.3.) At any rate, Balis's medical problems do not rise to the "extraordinary" level required to support a downward departure under the sentencing guidelines, see U.S.S.G. § 5H1.4, and in the Court's view, would not warrant a lower sentence than Balis received, which was the lowest sentence necessary to reflect the seriousness of Balis's crimes.

Balis's claim that counsel failed to provide financial information to the probation officer for inclusion in the PSR is, if anything, even less persuasive. There is no evidence that Balis's belated submission of this information, whatever its origins (but see S. Tr. 7-8; Govt. Letter-Brief at 30-31) had any effect on his sentence.

Finally, Balis's contention that counsel was derelict in failing to pursue a potential Brady motion regarding impeachment material relating to the witness Scorotow discovered by Mr. Bachner after the trial is totally meritless. First, it was the diligence of Mr. Bachner, who discovered the information in connection with another prosecution, that brought the matter to light. Second, the information did not in fact justify the conclusion that Scorotow had engaged in fraudulent conduct. And third, even if the information had been discrediting or revealed that Scorotow was a government informant, it was not material, since, as discussed above, Scorotow was merely a background witness. The critical evidence convicting Balis came from his co-conspirator, and from the tape recordings of Balis's own words.

## CONCLUSION

As discussed at the outset of this Opinion, Mr. Bachner's conduct of the trial was extremely effective. Balis was convicted not because of an ineffective defense, but because of overwhelming evidence of guilt. Defense counsel not only conducted a vigorous defense; he provided extensive additional services, without compensation, after Balis's conviction, in

13

connection with various issues relating to his incarceration.  (Bachner Aff. ¶¶ 6-7; O'Brien Aff. ¶¶ 5-18.)  Balis's arguments are not merely without merit, but are evidently presented in bad faith: after the trial, he complimented Mr. Bachner for his defense, and offered to recommend him to other defendants (Bachner Aff. ¶ 6 n.1), and when he belatedly attacked counsel's competence, he advised Mr. Bachner's associate that the attorney "should not take [the] motion personally" and in effect solicited Mr. Bachner to "look the other way" to help his client out, by not opposing his false allegations of misconduct.  (O'Brien Aff. ¶ 19; Bachner Aff. ¶ 3.)  His motion represents an utterly unjustified attack by an attorney who has disgraced his profession by criminal misconduct on one who has upheld its highest ideals by vigorously defending a putatively indigent defendant in the face of overwhelming evidence of guilt.

For all of the foregoing reasons, the petition is denied.  Because petitioner has not made a substantial showing of the denial of a constitutional right, a certificate of appealability will not issue.

SO ORDERED:

Dated: New York, New York
April 24, 2009

_____
GERARD E. LYNCH
United States District Court Judge

Copy to:

George Steven Balis
321 Undercliff Avenue
Edgewater, NJ 07020